**Vernon F. MINTON, Plaintiff–Appellant,**

v.

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. and The Nasdaq Stock Market, Inc., Defendants–Appellees.**

No. 02–1560.

United States Court of Appeals, Federal Circuit.

July 29, 2003.

Peter L. Brewer, Moser, Patterson & Sheridan, LLP, of Houston, TX, argued for plaintiff-appellant. On the brief was Jerry W. Gunn, Law Office of Jerry W. Gunn, of Houston, TX.

Randall L. Sarosdy, Akin, Gump, Strauss, Hauer & Feld, L.L.P., of Austin, TX, argued for defendants-appellees. With him on the brief was Gregory C. Mathis. Of counsel on the brief were Daniel Joseph and Beth H. Wilensky, Akin, Gump, Strauss, Hauer & Feld, L.L.P., of Washington, DC.

Before LOURIE, GAJARSA and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge LOURIE; Concurring opinion filed by Circuit Judge GAJARSA.

LOURIE, Circuit Judge.

Vernon F. Minton appeals from the final decision of the United States District Court for the Eastern District of Texas granting summary judgment that Minton's U.S. Patent 6,014,643 is invalid under 35 U.S.C. § 102(b) because it claims subject matter that was on sale more than one year prior to the filing of his patent application. *Minton v. Nat'l Ass'n. of Sec. Dealers, Inc.*, 226 F.Supp.2d 845 (E.D.Tex. 2002). Because the court's decision contains no legal error, we affirm.

## BACKGROUND

Minton is the sole inventor and owner of the '643 patent, which is directed to a computerized securities trading system. When using the system, individuals connect to a computer network through which they are able to post offers to trade securities as well as to select and reply to posted offers to cause trades to occur. More specifically, according to method claim 1, which is representative, offers to trade a security are transmitted over a network to an individual's computer, where the offers are ranked and displayed. The individual replies to an offer, and the system responds by "executing a trade of the security based on information contained in the offer for consideration specified in the reply to the offer, whereby the security is traded efficiently between the first individual [who entered the offer] and the second individual [who entered the reply in response to the offer]." '643 patent, col. 15, ll. 55–59.

Prior to his patent application's critical date, Minton leased a computer program and telecommunications network called "TEXCEN" to the brokerage firm R.M. Starks & Co. Minton, 226 F.Supp.2d at 855. TEXCEN performed similarly to what is claimed in the '643 patent, with one possible difference being the way it executed trades: TEXCEN required that a broker intervene to complete the trade. Id. at 856.

In a thorough and well-written opinion, the court granted summary judgment of invalidity on two grounds: (1) Minton's lease of TEXCEN was an anticipatory on-sale bar under 35 U.S.C. § 102(b); and (2) the claimed invention would have been obvious over TEXCEN in view of U.S. Patent 3,573,747, issued to Adams, under 35 U.S.C. § 103. Id. at 852, 875.

In opposition to the defendants' (collectively, "NASDAQ's") motion for summary judgment, Minton conceded that TEXCEN had been "on sale" prior to the critical date, id. at 855, and the court determined that, due to the strong similarities between TEXCEN and the invention claimed in the '643 patent, the invention had been "ready for patenting" at that time, id. at 859–60. Minton argued in his opposition that TEXCEN had not performed the claimed "executing" step, but the court rejected that argument, construing the term "executing" to mean simply "changing a memory location to indicate that an agreement had been reached between the two [trading] individuals." Id. at 865. The court also determined that the Adams patent had disclosed everything in the claimed method except the ranking and displaying steps, which were concededly part of TEXCEN. Id. at 876. The court concluded that it would have been obvious to modify Adams to include the ranking and displaying steps, as taught by TEXCEN. Id. at 878–79.

Minton filed a motion for reconsideration, in which he argued, inter alia, that the lease of TEXCEN was experimental and therefore not "on sale." The court denied the motion, stating only that "the motion for reconsideration should be denied for the reasons previously set forth in the court's memorandum opinion." Minton v. Nat'l Ass'n of Sec. Dealers, Inc., No. 9:00–CV–19, slip op. at 2 (E.D.Tex. July 15, 2002) ("Reconsideration Denial").

Minton timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review a district court's grant of a motion for summary judgment *de novo. Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.Cir.1998).

■ An assessment of the validity of a patent claim in light of an alleged sale involves, first, determining whether a sale is truly a "sale" within the meaning of 35 U.S.C. § 102(b), a question of law based on underlying facts. *See Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed.Cir.2002). The next step is claim construction, during which the court determines the scope and meaning of the patent claims, also a legal determination, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo, Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc). The final step involves a comparison of the asserted claims with the device or process that was sold. · A determination that a claim is invalid as being anticipated requires factual findings that "each and every limitation is found either expressly or inherently" in the device or process that was sold. *Celeritas Techs. Inc. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1360 (Fed. Cir.1998). Because "a patent is presumed to be valid, 35 U.S.C. § 282, and this presumption can only be overcome by clear and convincing evidence of facts to the contrary," *Dana*, 279 F.3d at 1375, the facts underlying a conclusion that a claim is unpatentable in light of a sale must be proven with clear and convincing evidence.

On appeal, Minton raises two arguments that TEXCEN was not "on sale" so as to trigger the on-sale bar of § 102(b). Minton first argues that, as in *In re Kollar*, 286 F.3d 1326 (Fed.Cir.2002), the license of the TEXCEN process was not a commercial offer for sale. Minton secondly argues that the court failed to analyze the experimental use issue, even though he properly raised it in post-judgment briefing after this court issued a decision in *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347 (Fed.Cir.2002), which he contends changed the landscape of experimental use law. Minton contends that several factors support a finding that the use was experimental, and, acknowledging that some factors here militate against a conclusion of experimental use, that the presence of opposing factors is the *sine qua non* of a factual dispute that should not be resolved on summary judgment.

Minton also argues that the court erred in its claim construction, and thus its invalidity analysis, in two respects. First, he contends that the court failed to construe the "executing" step as giving the trading individuals, rather than a broker, the "last say" in the trade, and that TEXCEN did not perform the "executing" step as properly construed. Second, he contends that the court failed to give weight to the "efficiently traded" result in the· "whereby" clause of the claim. In the context of the '643 patent, according to Minton, the phrase "efficiently traded" means traded by computer with minimal broker involvement (*i.e.*, pre-approval but not actuation of the trade), and TEXCEN did not meet that claim limitation.

Finally, on the issue of obviousness, Minton argues that there are genuine issues of material fact as to whether secondary factors of nonobviousness exist, specifically, long-felt need and the commercial success of the accused NASDAQ system.

NASDAQ responds that Minton raised the experimental use issue too late, in his motion for reconsideration after he had

conceded that TEXCEN had been "on sale." According to NASDAQ, that strategy is not permitted in the Fifth Circuit, the regional circuit in which the district court is located. On the merits, NASDAQ contends that Minton's sale of TEXCEN was not experimental, and that his only evidence of experimentation was his own testimony, which, lacking contemporaneous corroboration, is insufficient. NASDAQ further contends that Minton's lease agreement was unlike the patent or know-how license in *Kollar*, but instead effected the conveyance of equipment performing the claimed process, thus triggering the on-sale bar.

NASDAQ also responds that the construction of the "executing" step now raised by Minton on appeal was waived in the district court. On the merits, NASDAQ contends that Minton's only support for his definition of "executing" is his own affidavit, which is entitled to little weight, and that his new definition is inconsistent with the specification's description of a broker's involvement.

Finally, on the issue of obviousness, NASDAQ again argues that Minton's evidence regarding the secondary factors was not timely presented before summary judgment and therefore should not be considered by this court. On the merits, NASDAQ contends that his evidence fails to show a nexus between the secondary factors and the claimed invention.

Although the '643 patent contains both method and apparatus claims, they do not differ in any way material to the issues in this appeal, and Minton has not argued for their validity separately.

## A. *Minton's Sale of TEXCEN*

■ We first consider whether TEX-CEN was "on sale" within the meaning of 35 U.S.C. § 102(b). Subject matter that is "on sale" includes that which is (1) subject to a commercial offer for sale and (2) "ready for patenting" at the time of the offer for sale. *Pfaff v. Wells*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). Minton does not challenge the court's finding that TEXCEN was ready for patenting at the time he leased it to Starks; however, he contends that the lease did not satisfy the first *Pfaff* prong for two reasons: first, he likens the lease of TEX-CEN to the agreement in *Kollar*, which we held not to constitute an offer for sale; second, he asserts that there are genuine issues as to whether the lease of TEXCEN was for an experimental use, thereby precluding summary judgment.

■ We turn first to Minton's *Kollar*-based argument. As a preliminary matter, we consider that argument to be properly raised on appeal even though Minton did not raise it in the district court, either in his brief opposing summary judgment or in his motion for reconsideration. The *Kollar* decision issued in April 2002, after the district court's summary judgment decision and Minton's motion for reconsideration in February 2002, and we have discretion to reach an issue not decided below when "there have been judicial interpretations of existing law after decision below and pending appeal—interpretations which if applied might have materially altered the result." *Forshey v. Principi*, 284 F.3d 1335, 1356 (Fed.Cir.2002) (en banc) (quoting *Hormel v. Helvering*, 312 U.S. 552, 558–59, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)). We exercise that discretion in this instance in favor of considering the argument.

On the merits, *Kollar* is not helpful to Minton. In that case, Kollar sought a patent on a "process for the preparation of dialkyl peroxide," but the Patent and Trademark Office refused to grant the patent on the ground that an agreement between Kollar's company and Celanese

Corporation constituted an offer for sale within the meaning of the on-sale bar. *Kollar,* 286 F.3d at 1328–29. We reversed that decision because the Celanese agreement amounted only to a transfer of technical information about the claimed process and a license under any future patents to practice the process and sell the resulting products. *Id.* at 1330. We held that the transfer of know-how regarding a claimed process is not a "sale" of the process within the meaning of 35 U.S.C. § 102(b) because a know-how agreement "under which development of the claimed process would have to occur before the process is successfully commercialized, is not a sale." *Id.* at 1333. We also cited the established rule that merely granting a license under potential patent rights is usually not a "sale" of the invention within the meaning of the statute, *id.* at 1331; in contrast, "a commercial transaction arranged as a 'license' or a 'lease' of a product or a device ... may be tantamount to a sale (*e.g.,* a standard computer software license), whereupon the bar of § 102(b) would be triggered because 'the product is ... just as immediately transferred to the 'buyer' as if it were sold,'" *id.* at 1331 n. 3 (quoting *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1049 n. 2 (Fed.Cir.2001); *id.* at 1053 (Lourie, J., add'l remarks)). Furthermore, we recognized that "[a]ctually performing the process itself for consideration would ... trigger the application of § 102(b)." *Id.* at 1333.

■ Minton's transaction with Starks was unlike Kollar's transaction with Celanese. Whereas Kollar merely conveyed know-how to Celanese, Minton conveyed to Starks a fully operational computer program implementing and thus embodying the claimed method. Also, Minton conveyed with TEXCEN a warranty of workability, whereas Kollar's process had to be developed for commercialization. Thus, *Kollar* is factually distinguishable from the present case, and we accordingly hold that Minton's lease of TEXCEN, thereby enabling Starks to practice the invention, was an offer for sale within the meaning of the on-sale bar.

With respect to the concurrence of our thoughtful and articulate colleague, we would merely note that, while the statute indeed makes no distinction between various types of inventions in setting out the statutory bar, there are different types of sales of different types of inventions. It is not correct that "nothing in § 102(b) compels different treatment between an invention that is a tangible item and an invention that describes a series of steps in a process." The very nature of the invention may compel a difference. The sale of a tangible item is usually a straightforward event; the item is transferred from the seller to the buyer, who normally owns it outright. In contrast, a process is a series of acts, and the concept of sale as applied to those acts is ambiguous. In any event, Minton's lease of TEXCEN to Starks qualified as an on-sale event.

Turning next to Minton's experimental use argument, we first consider the threshold issue whether Minton waived the argument and thus whether we should reach it. That issue, in turn, depends upon whether Minton was entitled to raise the issue for the first time in a motion for reconsideration, in contrast to his concession before the court's decision that TEXCEN had been on sale.

■ Rule 59(e) of the Federal Rules of Civil Procedure allows a party to file a motion to alter or amend a judgment within ten days after entry of the judgment. Fed.R.Civ.P. 59(e). Minton filed such a motion in this case, but the court denied it, *Reconsideration Denial* at 2. In reviewing the court's denial, we apply regional circuit

law, in this case, Fifth Circuit law. *See Ajinomoto Co. v. Archer–Daniels–Midland Co.,* 228 F.3d 1338, 1350 (Fed.Cir. 2000). The Fifth Circuit vests a decision to reopen a case following a motion for reconsideration filed pursuant to Rule 59(e) to be within the court's sound discretion. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 174 (5th Cir. 1990). In exercising its discretion a court must balance two competing interests: "the need to bring litigation to an end and the need to render just decisions on the basis of all the facts." *Id.* Where the ground for reconsideration is evidence not brought forward previously, "the court should consider, among other things, the reasons for the moving party's default, the importance of the omitted evidence to the moving party's case, whether the evidence was available to the non-movant before she responded to the summary judgment motion, and the likelihood that the nonmoving party will suffer unfair prejudice if the case is reopened." *Id.*

■ Minton's motion for reconsideration was not grounded on newly submitted evidence in support of an argument previously raised; instead, Minton sought reconsideration on the ground of, *inter alia,* a new argument (experimental use), and he submitted new evidence (his own affidavit) in support of that new argument. The court tersely denied Minton's motion without clearly explaining whether it was exercising its discretion not to consider Minton's new argument or it had considered the new argument but found that argument unconvincing. We conclude that the court took the former course, for the court stated that its denial was "for the reasons previously set forth in the court's memorandum opinion," which did not discuss experimental use. *Reconsideration Denial* at 2.

If that was indeed the case, the court acted well within its discretion in declining to entertain Minton's new argument. The experimental use doctrine has long been a fixture of patent law, *see, e.g., City of Elizabeth v. Am. Nicholson Pavement Co.,* 97 U.S. 126, 24 L.Ed. 1000 (1877) ("The use of an invention ... by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a [barring public] use."), and Minton was surely aware of the experimental use exemption when NASDAQ filed its summary judgment motion. Minton's motion for reconsideration cited *EZ Dock* as a factually analogous case, and he now argues that *EZ Dock* was a new development in experimental use law, justifying its late presentation of the experimental use issue. We disagree for several reasons. First, *EZ Dock* did not alter, let alone expand, the law on experimental use in any way, let alone a material way. On the contrary, *EZ Dock* simply applied settled experimental use law to the facts before it. While Judge Linn's concurring opinion provides a convenient list of the factors that courts have considered in deciding experimental use questions, *EZ Dock,* 276 F.3d at 1357 (Linn, J., concurring), all of those factors can be traced to earlier precedent. We therefore find little merit in Minton's contention that *EZ Dock* was a reason justifying his belated attempt to raise the experimental use argument. Nor has Minton come forward with any other justification for his tardiness in raising the issue. On the other hand, Minton's shifting tactics certainly had some prejudicial effect on NASDAQ, who was forced to respond to Minton's new argument, and placed an extra burden on the court, which had already carefully sifted through the numerous complex issues in the case to reach a final decision. Overall, the balance tips against Minton, and the district court acted well within its discretion when it

declined to entertain Minton's new argument. We therefore do not disturb the district court's conclusion that Minton's lease of TEXCEN to Starks was a "sale" within the meaning of 35 U.S.C. § 102(b).

### B. *Claim Construction and Anticipatory Bar*

■ Having concluded that TEXCEN was indeed "on sale" for purposes of assessing the validity of the '643 patent claims, we turn to whether TEXCEN bars those claims. The answer to the question turns on how the claims are construed. We agree with NASDAQ that the district court correctly construed the "executing" step of claim 1. In pertinent part, claim 1 states:

> 1. A method for trading securities between individuals, comprising:
>
> * * *
>
> executing a trade of the security based on information contained in the offer for consideration specified in the reply to the offer, *whereby the security is traded efficiently between the first [offering] individual and the second [replying] individual;*
>
> * * *.

'643 patent, col. 15, ll. 55–59 (emphasis added). The court construed this step to mean "changing a memory location to indicate that an agreement had been reached between the two [trading] individuals," as Minton had initially proposed and as NASDAQ did not dispute. *Minton,* 226 F.Supp.2d at 865 (citing an earlier *Markman* order). However, in Minton's opposition to NASDAQ's motion for summary judgment of invalidity, Minton argued for a different construction, urging that the court interpret the phrases "between individuals" and "traded efficiently" so as to create distinctions between the claimed invention and TEXCEN.

NASDAQ first contends that Minton's shifting claim construction arguments in the district court should not be accepted, and it argues that we should therefore not entertain the construction he proffered after the *Markman* hearing. We disagree. However suspect Minton's tactics may appear, the district court in this case did consider Minton's arguments in favor of a new construction before rendering summary judgment. As such, we will review the district court's decision regarding those arguments.

The court did not err in rejecting Minton's arguments in favor of a new construction. Minton contends that the phrase "between individuals" excludes systems like TEXCEN, which required that a broker affirmatively intervene to execute the trade after ensuring that the trade complied with certain conditions, such as the "best execution rule." * We begin our construction of the phrase "between individuals" with the language of the claim itself. *Tex. Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1201 (Fed.Cir.2002). That phrase appears in two places: in the preamble ("trading securities between individuals") and in a whereby clause of the executing step ("the security is traded . . . between the first individual and the second individual"). Even assuming that we should give weight to both occurrences of the phrase, the phrase does not speak to the questions of how the trade is executed or who or what performs the execution; it simply indicates that a security is traded

---

* The best execution rule required brokers to fill a client's order at the best available price. Because an individual user of TEXCEN may select an offer that is not at the best available price, a broker whose client was using TEX-CEN may in some instances have overridden the client's selection of an offer to trade and executed the trade at a different, more favorable price.

between individuals—in other words, that ownership of a security passes from one individual to another. The plain language of the claim itself therefore does not exclude the scenario in which the broker has the "last say" in executing the trade.

Moreover, the written description of the invention confirms what the plain language of the claim says. *See id.* at 1203–04 ("Because words often have multiple dictionary definitions, ... the intrinsic evidence must always be considered."). The '643 patent describes an embodiment in which a broker's involvement during trade execution is substantial. In particular, the specification describes that a broker will validate that the seller has the security and the buyer has adequate funds before a trade is executed. '643 patent, col. 12, ll. 39–49; col. 12, l. 61—col. 13, l. 6; col. 13, ll. 26–31. The district court's construction encompasses that embodiment of the invention, whereas the construction urged by Minton attempts to draw a distinction (*i.e.,* allowing broker pre-approval of the consideration on each side of the trade but not allowing possible broker preemption based on the best execution rule) that the claim language does not support. Even if there were instances in which the best execution rule altered the trading price and parties such that the claimed method was not followed in those instances, the claim would nonetheless have been practiced in instances in which the best execution rule was not invoked to alter the trading price or parties. In those instances, TEXCEN performed the executing step exactly as stated.

■ The district court was also correct in not giving weight to the "traded efficiently" phrase in the whereby clause of the executing step. A whereby clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited. *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n,* 988 F.2d 1165, 1172 (Fed.Cir. 1993). That is the case here. The term "efficiently" on its face does not inform the mechanics of how the trade is executed, and nothing in the specification or the prosecution history suggests otherwise. Rather, the term "efficiently" is a laudatory one characterizing the result of the executing step. We therefore hold that the district court correctly declined to give the term the meaning Minton has proposed.

In sum, Minton's arguments in favor of a different construction of the "executing" step are not persuasive, and we perceive no other error in the court's construction of that step. Minton conceded in the district court that TEXCEN performed the trade execution step as construed by the district court and by this court. *See Minton,* 226 F.Supp.2d at 867. Minton's validity arguments on appeal are only premised on his proposed construction of the claims, which we have rejected. Given that the court's construction of the "executing" step is correct, it follows that TEXCEN is an anticipatory statutory bar. We therefore affirm the district court's grant of summary judgment that the claims of the '643 patent are invalid under § 102(b).

## C. *Obviousness*

In light of our conclusion that TEXCEN is an anticipatory statutory bar to the claimed invention, we need not review the district court's alternative ground for granting summary judgment of invalidity: that the claims would have been obvious to one skilled in the art at the time of the invention over Adams in view of TEXCEN.

## CONCLUSION

The district court properly determined that TEXCEN was an on-sale bar to the claims of the '643 patent. Accordingly, we

*AFFIRM.*

GAJARSA, Circuit Judge, concurring.

I concur in the judgment of the court. I agree that Minton's lease of TEXCEN to Starks was a sale within the meaning of 35 U.S.C. § 102(b). In so holding, however, the majority, citing *In re Kollar*, 286 F.3d 1326 (Fed.Cir.2002), also suggests that invented processes warrant different treatment from invented tangible products in an on-sale bar analysis. *See ante* at 1378–1379. To the extent that *Kollar* can be read in that way, I disagree with *Kollar*. I write separately because nothing in § 102(b) compels differential treatment between a sale of an invention that is a tangible item and an invention that is a series of steps in a process.

My disagreement with the majority on this matter is rooted in the plain and unambiguous language of § 102(b), which states that an invention cannot be patented if the "*invention* was ... on sale in this country, more than one year prior to the date of the application ...." 35 U.S.C. § 102(b) (emphasis added). It is elementary that either a tangible product or an intangible process can be such a patentable "invention." *See* 35 U.S.C. § 101 (2000). Thus, for an on-sale bar to operate pursuant to § 102(b), there need only be a commercial sale or offer for sale of an "invention," be it tangible product or intangible process, more than one year prior to the filing of the application. *See Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed.Cir.2001).

Moreover, the majority's statement that "a know-how agreement 'under which development of the claimed process would have to occur before the process is successfully commercialized, is not a sale,'" *ante* at 1378 (quoting *Kollar*, 286 F.3d at 1333), implies that the process sold in *Kol-lar* was not ready for patenting and therefore could not be commercialized by the patentee. While I agree with the general statement that a sale of know-how that is not ready for patenting does not trigger the on-sale bar, *Kollar* does not support such a statement because this court in *Kollar* concluded "Kollar's reduction to practice of the invention rendered it 'ready for patenting.'" *Kollar*, 286 F.3d at 1330 (quoting *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998)). Assuming the invention is "ready for patenting," *Pfaff*, 525 U.S. at 67, 119 S.Ct. 304, it is the "sale" of the invention, i.e., the commercialization by the *patentee*, that triggers the on-sale bar, not performance of the process by the *transferee* or commercialization of the product resulting from that performance.

Here, the invalidating "sale" occurred when Minton conveyed TEXCEN to Starks. This transfer of the steps in the later-claimed method marked the "first commercial marketing," *id.* at 67, 119 S.Ct. 304, of the invention, thus implicating the on-sale bar and its attendant policy concern that a patentee not "preserve the monopoly ... for a longer period than is allowed by the policy of the law ....," *id.* at 64, 119 S.Ct. 304.

Because a commercial sale of an invention, be it product or process, triggers the on-sale bar, I respectfully concur in the judgment of the court.